**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| COLE J. HEITZ, | |
| Plaintiff, | No. 09-CV-2019-LRR |
| vs. | **ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

_____

*TABLE OF CONTENTS*

**I.    INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.   PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**III.  PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**IV.   FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    **A.   Heitz's Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    **B.   Subjective Complaints** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    **C.   Heitz's Work History** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    **D.   Heitz's Testimony** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    **E.   Heitz's Medical History** . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        **1.   Treating sources** . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        **2.   Non-treating sources** . . . . . . . . . . . . . . . . . . . . . . **11**
    **F.   Vocational Expert's Testimony** . . . . . . . . . . . . . . . . . . . . **12**

**V.    ALJ'S DECISION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

**VI.   HEITZ'S OBJECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

    **A.   Substantial Evidence to Support the ALJ's Decision** . . . . . . . . . . . **16**
        **1.   Heitz's credibility determination** . . . . . . . . . . . . . . . . . . **16**
        **2.   ALJ's reliance on Heitz's Statements** . . . . . . . . . . . . . . . **16**
        **3.   Credibility determination of Dr. Blackmore** . . . . . . . . . . . **17**
        **4.   Credibility determination of Dr. Johnson** . . . . . . . . . . . . . **18**

          *5.      Heitz's parents' credibility determination* . . . . . . . . . . . . . **19**

    **B.**     *Evaluation of Heitz's Subjective Impairments* . . . . . . . . . . . . . . **20**

    **C.**     *Reliance on May's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . **22**

    **D.**     *Development of the Record* . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

    **E.**     *Notice of Right to Representation* . . . . . . . . . . . . . . . . . . . . . . . **25**

**VII.**  **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

## I. INTRODUCTION

The matter before the court is Plaintiff Cole J. Heitz's ("Heitz") Complaint (docket no. 4) for judicial review of the Social Security Commissioner's ("Commissioner") decision to deny his application for Title XVI supplemental security income benefits ("SSI Benefits").

## II. PRIOR PROCEEDINGS

On February 24, 2006, Heitz filed an application ("Application") for SSI benefits. In the Application, Heitz alleged that the onset date of his disability was May 25, 2001. On April 28, 2006, the Commissioner denied the Application. On June 12, 2006, Heitz filed a Request for Reconsideration. On October 13, 2006, the Commissioner denied the Request for Reconsideration. On November 27, 2006, Heitz requested an evidentiary hearing before an administrative law judge. On May 22, 2008, administrative law judge Denzel R. Busick ("ALJ") held an evidentiary hearing ("Hearing"). Heitz was not represented by counsel at the Hearing. Heitz's parents, Richard and Joyce Heitz appeared and testified at the Hearing. Vocational expert Vanessa May ("May") also testified at the Hearing.

On September 30, 2008, the ALJ denied Heitz's request for SSI benefits. On October 28, 2008, Heitz filed a Request for Review of Hearing Decision/Order ("Request for Review") with the Appeals Council. On February 11, 2009, the Appeals Council denied Heitz's Request for Review. Thus, the ALJ's September 30, 2008 decision stands as the Commissioner's final decision.

On March 20, 2009, Heitz filed the Complaint. On June 2, 2009, the

Commissioner filed an Answer (docket no. 8).  On July 6, 2009, Heitz filed a brief ("Heitz Brief") (docket no. 11) arguing that: (1) the ALJ's decision is not supported by substantial evidence in the record as a whole; and (2) the ALJ failed to fully develop the record.  On August 31, 2009, the Commissioner filed a responsive brief ("Commissioner Brief") (docket no. 12).  On September 11, 2009, Heitz filed a Reply Brief (docket no. 13).  That matter is fully submitted and ready for decision.

### III.  PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may conduct a judicial review of the Commissioner's final decision.  *See* 42 U.S.C. § 405(g) ("Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party [. . .] may obtain a review of such decision[.]").  "The court shall have the power to enter [. . .] a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  *Id.*  "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*

The court must consider whether "substantial evidence on the record as a whole supports the Commissioner's decision[.]"  *Schultz v. Astrue*, 479 F.3d 979, 982 (8th Cir. 2007).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination."  *Pirtle*, 479 F.3d 931, 933 (8th Cir. 2007).  The court reviews evidence both supporting and detracting from the Commissioner's decision.  *Id.*  If the ALJ's credibility determinations are "supported in the record by substantial evidence," the court must defer to them.  *Id.*  It shall not reverse the Commissioner's decision "simply because some evidence supports a conclusion other than that of the Commissioner."  *Id.*  "'[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [ALJ's] decision.'"  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (quoting *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993)).  The court must not re-weigh

the evidence, but rather simply inquire whether "a reasonable person would find [the evidence] adequate to support the ALJ's determination." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Although inaccuracies and unresolved conflicts of evidence can serve as a basis for remand, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case[.]'" *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)).

## *IV. FACTS*

### *A. Heitz's Background*

Heitz was born in 1987. He graduated from high school in 2005. Heitz is currently single and has no children. He lives with his parents in Charles City, Iowa.

### *B. Subjective Complaints*

In his Application paperwork, Heitz claims that he suffers from obsessive compulsive disorder ("OCD"), bipolar disorder, depression and anxiety and panic disorder. He claims that these conditions limit his ability to work because they cause anxiety and his OCD causes "contamination issues." Record ("R.") at 165. Heitz claims that these conditions began in 1990. He contends that he became unable to work due to his conditions on May 25, 2001. Heitz continued to work after his conditions first started bothering him. However, he "walked off the job" as a production worker due to conflict with his supervisor. R. at 165.

Heitz claims he has not sought medical testing because his OCD causes a "fear of contamination from needles and other things in a doctor[']s office." R. at 172. Heitz claims that his social skills are "very limited" and he stays home "most of the time." *Id.* He claims that his sleep patterns are "poor" and that he "sleeps a lot during the day and is up late at night." *Id.*

In a typical day, Heitz wakes up around 11:00 a.m.  He eats, does chores and then does hobbies or visits friends.  Heitz's chores include mowing, shoveling snow and small repairs.  He "worries" when he has to run a lawn mower.  *Id.* at 176.  Heitz feeds, waters and walks animals, including his uncle's farm animals.  His parents sometimes help him care for animals.  Heitz needs encouragement to do chores because he is "not easily motivated."  *Id.*  He also fears that cleaning supplies might harm him.

Heitz goes outside "daily."  *Id.* at 177.  His hobbies include "computer[s], movies, animals, rebuilding bikes, mowers [and] woodworking."  *Id.* at 178.  Heitz spends time with others "daily[,]" in person, on the phone or on the computer.  *Id.*  He regularly goes to the bowling alley or other people's homes.  However, Heitz does not participate in group or club activities and sometimes has to be reminded to go places.  He usually does not need someone to accompany him when he goes out, unless it is a "new situation."  *Id.* at 178.  Heitz stays home when his OCD is "out of control."  *Id.* at 177.  In the evening, he returns home to eat or sometimes goes out.  At night, Heitz uses the computer or watches television before going to bed around 12:00 or 1:00 a.m.

Heitz is able to dress himself.  However, his OCD sometimes causes him to bathe a lot and he is afraid of shaving due to a fear of blood.  He sometimes needs "notes" to remind him to take care of "personal needs and grooming."  *Id.* at 176.  Heitz does not like going to the dentist or doctor.  He is afraid of hospitals and fears he might "catch something from sick people."  *Id.*  Heitz does not manage his own medication because he is afraid he will take too much or forget if he has already taken it.  He is able to feed himself but sometimes questions whether the food is "done enough."  *Id.* at 175.  He usually prepares leftovers or "processed foods" in the microwave.  *Id.* at 176.  Heitz does not like to use the stove or oven due to a fear of fire.  He prepares at least one meal per day and can do so in about ten minutes.

When Heitz goes out, he drives a car, rides in a car or rides a bicycle.  He drives

"in town" only, because highways make him nervous. *Id.* at 177. He shops in stores or on the computer. He buys food for animals or items he "wants or needs." *Id.* However, he shops "fast" because his anxiety levels increase while shopping. *Id.* Heitz is able to pay bills and count change, but does not manage a bank account because he has no income.

Heitz claims to have problems getting along with others because his "anxiety gets high when he has [had] enough or something or someone bothers him." *Id.* at 179. He also claims that his conditions can cause him to become "antisocial" and "stay home." *Id.*

Heitz claims that he has problems with talking, completing tasks, concentration, understanding, following instructions, using his hands and getting along with others. He claims that at times he "won't talk," is not motivated, "can't think clearly," or gets "so upset [he] can't reason." *Id.* He claims he has a short attention span. Heitz also claims he has low reading comprehension skills, which makes it difficult for him to follow written directions. However, he can follow spoken instructions if he "listens and [is] not nervous[.]" *Id.* Heitz claims he does not get along well with authority figures because they "make[] him nervous or [he] gets upset and angry or they don't know of [his] disabilities." *Id.* at 180. He claims he does not handle stress well because his "anxiety levels get high." *Id.* Heitz claims he does not handle changes in routine well because he is a "very schedule[-oriented] person." *Id.*

### C. Heitz's Work History

Heitz has never worked full-time. He has had several part-time jobs that lasted less than two to three months. In 2002, Heitz worked as a busboy. He earned $5.00 per hour and worked eight hours per week. As a busboy, he lifted trays of dirty dishes and carried "big boxes of food items from basement to upstairs." R. at 229. In April 2005, Heitz did "delivery and clean up" work for a lawn mower service. *Id.* at 228. He earned $6.00 per hour and worked fifteen hours per week.

From August of 2005 until October 6, 2005, Heitz worked for a food manufacturer

as a "production worker." *Id.* He earned $6.75 per hour and worked eighteen hours per week.

A few weeks prior to the Hearing, Heitz did "temporary service" work for Sherman Nursery. R. at 29. He loaded plants onto pallets.

Heitz's longest term of employment was for several months as a part-time security guard at an ethanol plant. He worked 36 hours per week. However, he lost this job when the company he worked for "lost their security contract." Heitz's Brief at 5.

### D. Heitz's Testimony

Heitz testified that he is approximately 5'7" to 5'8" tall and weighs 282 pounds. His weight fluctuates "between 10 and 20 pounds" due to "medications and stuff." R. at 28. Heitz can read, write and speak, but sometimes has a "hard time" reading. *Id.* He has "a little difficulty" with math, but can do some basic addition, subtraction, multiplication and division. *Id.*

Heitz testified that OCD has been problematic for him. He testified that he is "afraid of germs and blood and like contamination, so [he] usually wash[es] [his] hands a lot, and it has been to the point where [he] wash[es] [his] hands so much [they] get raw and bleed." *Id.* at 30. He testified that he washes his hands "probably about 23 times" per day. *Id.*

Heitz testified that bipolar disorder has been problematic for him. He stated that he is in a "manic stage" about "70-some percent" of the time. *Id.* at 31. His medications have helped his bipolar disorder "quite a bit" but he "still [has] problems with certain things with them." *Id.* at 32. At times, his medication makes him groggy or drowsy and causes him to sweat.

Heitz testified that he has "a few" close friends. *Id.* at 34. He and his friends "hang out" and "watch movies and stuff." *Id.* Heitz usually associates with his friends at their homes. It took him "a long time to get comfortable around [his friends,]" but he

feels safe around them as "long as there [aren't] new people." *Id.* at 35.

### E. Heitz's Medical History

Heitz's medical history relates primarily to his OCD, bipolar and anxiety disorders. The record does not indicate any significant physical issues.

#### 1. Treating sources

On May 25, 2001 Heitz began seeing Dr. Michael Blackmore, a psychiatrist, for his OCD, bipolar disorder and anxiety. That same date, Dr. Blackmore prescribed Heitz Imipramine and Xanax. On May 30, 2001, Dr. Blackmore noted that the Imipramine "appear[ed] to have no effect, good or bad[.]" R. at 299. Accordingly, Dr. Blackmore discontinued the Imipramine and prescribed Heitz Anafranil and Stelazine, in addition to Xanax. Dr. Blackmore also noted that Heitz was "very impaired" by OCD and was "unable to function effectively at home." *Id.* Dr. Blackmore also referred Heitz to Dr. Lorne Johnson, a psychologist, for individual psychotherapy.

On June 1, 2001, Dr. Johnson evaluated Heitz. Dr. Johnson observed that Heitz had "a history of depression with a question of Schizo Affective Disorder, Panic Disorder, and [OCD.]" R. at 283. Dr. Johnson noted that Heitz's obsessions involve "contamination" and that Heitz was "quite concerned about getting AIDS, particularly when there is blood involved or cuts." *Id.* at 283-84. Dr. Johnson reported that Heitz's OCD "has affected him significantly in his school career and personal life." *Id.* at 284. Dr. Johnson also noted that Heitz experienced "some depression, reporting sad mood, loss of motivation, irritability [and] poor self-esteem." *Id.*

On February 7, 2002, Heitz presented at the emergency room in Charles City, Iowa with his parents and brother. Dr. David Schrodt examined Heitz and reported that Heitz had "an apparently extensive history of mental illness which extends back at least a year." R. at 285. Heitz had experienced "exacerbation of symptoms" and his mother reported that he had "made threats against himself and threats against her and other members of the

family." *Id.* Dr. Schrodt observed that Heitz experienced "[m]ajor depression with suicidal and homicidal ideation [and OCD] with increased anxiety." *Id.* Dr. Schrodt opined that Heitz "need[ed] to be admitted to the hospital" and his parents agreed. *Id.*

On July 25, 2002, Dr. Blackmore noted that Heitz was "functioning better" overall but his OCD symptoms were "still prominent." *Id.* at 282. Dr. Blackmore observed that Heitz's "anxiety/anger/distress still escalates relatively frequently." *Id.*

On September 4, 2002, Dr. Blackmore reported that Heitz "still has a great fear of contamination." *Id.* at 281. Specifically, Heitz told Dr. Blackmore of the anxiety he experienced when an earring was passed around the classroom for observation. His fear of AIDS also made him so uncomfortable with a school blood drive that his mother had decided "not to ask him to go to school that day." *Id.*

On October 30, 2002, Dr. Blackmore noted that Heitz's "anxiety and [OCD] . . . concerning contamination are still very prominent." *Id.* at 280. Dr. Blackmore observed that Heitz's mother did "a very good job" of working with his OCD and anxiety. *Id.*

On December 30, 2002, Dr. Blackmore reported that Heitz "continues to make slow improvement in anxiety, [OCD], and depression." *Id.* at 279. Heitz also began taking a medication called Seroquel, which he and his mother reported as having a "clearly positive" effect. *Id.* Dr. Blackmore noted that Heitz was "making signif[icant] progress in his level of school functioning" and he "stays away from fewer class activities [because] his fear of contamination" had decreased. *Id.* However, Dr. Blackmore observed that Heitz was not very involved in their meetings and that his mother "d[id] most of the talking." *Id.*

On March 12, 2003, Dr. Blackmore found that Heitz "made very remarkable progress since [their] last appointment." *Id.* at 278. Specifically, his "anxiety and [OCD] . . . [are] such that he is able to function much more productively at home, at school and socially." *Id.* Dr. Blackmore noted that Heitz obtained his driver's license and enjoyed

a school ski trip. Dr. Blackmore "could not have guessed that [Heitz] would make such great strides[.]" *Id.* Heitz also recognized his progress but still expressed a desire to be "off" medication. *Id.*

On June 7, 2004, Dr. Blackmore reported that Heitz's symptoms had been "marginally manageable." *Id.* at 277. However, they had been "more difficult" because his older brother was home from college. *Id.* His most severe symptoms occurred "when there is an irritation or a disturbance in [his] usual routine." *Id.* Dr. Blackmore noted that, when Heitz becomes upset, "he will quickly become aggressive." *Id.* On one occasion, Heitz's mother had to call the police when he became aggressive toward his brother. However, "the police handled the situation well." *Id.*

In July 2004, Heitz was assaulted with an aluminum baseball bat. During the assault, he raised his arm to protect himself and suffered an injury to his right hand. Heitz suffered a fracture on his right hand and received treatment from his family doctor, Dr. Paul Royer. On September 17, 2004, Dr. Royer noted that there was "[s]ome deformity" of the joint but "functionally the hand is completely normal." R. at 297.

On January 19, 2005, Heitz had his last visit with Dr. Blackmore. Dr. Blackmore noted that Heitz was a senior in high school and had been on the honor roll. However, he had experienced "friction" with his older brother during the holidays and "law enforcement was called a few times." *Id.* at 276. Dr. Blackmore found that Heitz was "very restricted" due to his OCD symptoms. *Id.*

On July 13, 2005, Dr. Blackmore wrote to Disability Determination Services ("DDS"). Dr. Blackmore opined that Heitz is "moderately to severely impaired in most areas of mental functioning." *Id.* at 275. He reported that Heitz is "making progress but is still very impaired currently." *Id.* Dr. Blackmore opined that Heitz "will make slow progress and requires slow introduction to any change." *Id.* However, Dr. Blackmore stated that, "after years [Heitz will] be able to work half time at a simple low stress job."

*Id.*

## 2.    *Non-treating sources*

In 2006, DDS referred Heitz to Dr. Johnson for a Consultative Psychological Examination.    Dr. Johnson noted that Heitz had been "referred by Disability Determination Services for evaluation of mental status, which includes consideration of adaptive functioning, behavioral observations, history, and diagnostic impressions." *Id.* at 304.  Dr. Johnson found that Heitz had "reached some degree of stability in the thought disorder area . . . [and] these appear to be in remission." *Id.* at 307.  Dr. Johnson also found that Heitz's depression had improved, although he continued to experience some symptoms, including sleep disturbance, irritability, tiredness, lack of energy, and concentration problems." *Id.*  Dr. Johnson observed continuing bi-polar symptoms, including "some very significant swings in mood, irritability, pressured speech, flight of ideas [and] distractibility." *Id.*  However, Dr. Johnson opined that "[t]he most overriding concern . . . is his OCD, which does appear to be minimally controlled, and he finds very limiting in his ability to function on a day to day basis." *Id.*  Ultimately, Dr. Johnson concluded that "it seems unlikely that he could maintain attention, concentration, and pace, or to interact appropriately with supervisors, coworkers, and the public, or to use good judgment, or to respond appropriately to changes in the workplace." *Id.*  Dr. Johnson found that Heitz "is able to remember and understand instructions[.]" *Id.*  However, Dr. Johnson believed that he should not be allowed "to handle cash benefits because of his [b]ipolar symptoms." *Id.*

On April 26, 2006, Dr. David A. Christiansen reviewed Heitz's medical records and provided DDS with a Psychiatric Review Technique assessment and Mental Residual Functional Capacity ("RFC") Assessment.    On the Psychiatric Review Technique assessment, Dr. Christiansen diagnosed Heitz with bipolar disorder and anxiety related to "[r]ecurrent obsessions or compulsions[.]" *Id.* at 318.  Dr. Christiansen determined that

Heitz had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. On the Mental RFC Assessment, Dr. Christiansen found that Heitz was moderately limited in his ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. In conclusion, Dr. Christiansen noted that:

> The primary medically determinable impairment is [OCD], with secondary impairment of Bipolar Disorder. These impairments are severe but do not meet a listing. [Heitz] can be expected to have moderate limitations in carrying out instructions and in maintaining attention and concentration. Interpersonal relationships will be moderately impaired, especially with supervisors, secondary to compulsive disorder. He is capable of simple, routine work-like activities. The credibility of the allegations is somewhat eroded by [Heitz's] lack of current participation in treatment.

*Id.* at 311.

### F. Vocational Expert's Testimony

Vocational expert Vanessa May at the Hearing. When posing a hypothetical question to May, the ALJ set forth the following RFC:

> [T]hey would have mild limits on activities of daily living, moderate limits on social functioning, moderate limits on concentration, persistence and pace. They would at all times

be at least moderately limited in the ability to carry out detailed instructions, maintain extended concentration, perform within customary tolerances unless they have extra or special supervision. They would be moderately limited in the ability to deal with the general public. They'd be moderately limited in the ability to accept instruction or criticism from supervisors, moderately limited in the ability to ask simple questions or request assistance, to respond to changes in the work setting and the work routine. All of those moderates would tend to . . . prevail together throughout most of any eight-hour work periods.

R. at 40. May testified that a person with this RFC would likely be unable to perform Heitz's past relevant work as a security guard. However, May testified that a person with this RFC could perform certain unskilled work, including photo copy machine operator, cafeteria attendant and courier.

## V. ALJ'S DECISION

The ALJ determined that Heitz is not disabled. To determine whether a claimant is disabled, the ALJ must complete a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)–(f) (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

>(4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.  If the claimant is able to perform her previous work, she is not disabled.
>
>(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen*, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing *Yuckert*, 482 U.S. at 140–42); *see also* 20 C.F.R. § 404.1520(a)–(f).

In the first four steps, Heitz has the burden of proving his RFC renders him disabled.  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  If he meets this burden, the burden of production then shifts to the Commissioner to prove the claimant retains the RFC to perform other work in the national and regional economy.  *Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004).  The RFC is the most an individual can do despite his or her limitations.  20 C.F.R. § 416.945(a)(1).  "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'"  *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).  If the claimant cannot make an adjustment to other work existing in significant numbers in the national economy, then the ALJ will find the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).  At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion remains on the claimant.  *Goff*, 421 F.3d at 790.

At the first step of the analysis, the ALJ determined that Heitz had not engaged in substantial gainful activity since his alleged onset of disability.  At the second step, the

ALJ found that Heitz had the following severe impairments: OCD, depression, anxiety and bipolar disorder. The ALJ found that these impairments "cause significant limitations in [his] ability to perform basic work activities." R. at 15. At the third step, however, the ALJ found that Heitz "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments[.]" *Id.* at 16.

At the fourth step, the ALJ found that Heitz had the following RFC:

> [He] has the residual functional capacity to perform a full range of work at all exertional levels subject to the following non-exertional limitations: He has moderate limitations in his ability to carry out detailed instructions, to maintain extended concentration, to perform within customary tolerances without extra or special supervision, to deal with the general public, to accept instructions and criticism from supervisors, to consistently get along with co-workers, to ask simple questions or to ask for assistance, and to respond to changes in setting and routine.

*Id.* at 17.

In determining Heitz's RFC, the ALJ purported to consider "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" *Id.* The ALJ also purported to consider opinion evidence and "the entire record." *Id.* The ALJ found that Heitz's "medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]" *Id.* at 18. However, the ALJ found that Heitz's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment" for various reasons. *Id.*

The ALJ afforded Dr. Johnson's opinion "limited weight." *Id.* at 20. However, the ALJ found that "[t]he expert opinion of the State agency [doctor, Dr. Christiansen], which is based on a complete review of the medical evidence of record . . . is consistent with the medical evidence of record and is afforded significant weight." *Id.* at 21.

The ALJ found that Heitz is unable to perform his past work as a security guard because such work is "semi-skilled." *Id.* The ALJ found that Heitz's RFC "effectively limits him to performance of unskilled work." *Id.* However, the ALJ concluded that, "considering [Heitz's] age, education, work experience, and RFC, [he] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 22. Accordingly, the ALJ found that Heitz "has not been under a disability . . . since the date the [A]pplication was filed." *Id.*

## VI. HEITZ'S OBJECTIONS

Heitz claims the ALJ erred because: (1) the ALJ's decision is not supported by substantial evidence in the record as a whole; (2) the ALJ improperly evaluated Heitz's subjective impairments; (3) the ALJ relied upon flawed testimony of a vocational expert; (4) the ALJ failed to fully develop the record; and (5) the ALJ failed to inform Heitz of his right to be represented by counsel prior to the Hearing.

### A. Substantial Evidence to Support the ALJ'S Decision

Heitz argues that the ALJ's decision is not supported by substantial evidence for several reasons. First, he asserts that the ALJ "improperly evaluated [Heitz's] credibility[.]" Heitz Brief at 10. Second, he contends the ALJ improperly relied upon Heitz's testimony that "he was doing somewhat better and had found some ways to cope when stress or his OCD increased." *Id.* at 11. Third, Heitz argues that "the ALJ failed to credit those who were in a better position to determine [Heitz's] abilities—his parents, Dr. Blackmore and Dr. Johnson." *Id.* at 12. The court shall address each of these arguments, in turn.

#### 1. Heitz's credibility determination

The court shall address this argument in Section VI.B, *infra*.

#### 2. ALJ's reliance on Heitz's statements

Heitz argues that the ALJ improperly relied on Heitz's testimony that "he was doing

better and had found some ways to cope when stress or his OCD increased." Heitz Brief at 11. Heitz contends that the ALJ "failed to recognize that [Heitz's] means of coping—separating himself from the problem environment—was the very cause of [his] not being able to perform [substantial gainful activity] in a competitive work environment." *Id*. at 11-12.

The court finds that the ALJ properly relied on Heitz's testimony and considered Heitz's means of coping. The ALJ relied on Heitz's testimony that "he has learned some coping skills." R. at 16. However, the ALJ also recognized that, "[e]ven with medication, [Heitz] has reached degrees of being out of control or almost out of control." *Id*. at 18. The ALJ went on to explicitly note that Heitz "works through [these episodes] by removing himself" from the situation. *Id*. Accordingly, the ALJ was aware of and appropriately considered the fact that Heitz often deals with uncomfortable situations by walking away.

Heitz also argues that the ALJ's reliance on his testimony is "not well placed" because Heitz "does not have good insight into his condition." Heitz Brief at 12. Heitz contends that, because Dr. Johnson reported that he had "fair to poor insight," it was improper to rely on his own testimony regarding his condition *Id*. Again, the ALJ explicitly acknowledged that Heitz's "[j]udgment and insight were fair to poor." R. at 20. Further, Dr. Johnson's opinion that Heitz's judgment and insight are "fair to poor" was a standalone statement and was not tied in any way to Heitz's ability to accurately assess his condition and resulting limitations. R. at 307. Accordingly, the court finds that the ALJ properly relied on Heitz's testimony regarding his condition.

### 3. *Credibility determination of Dr. Blackmore*

Heitz argues that the ALJ "failed to credit" Dr. Blackmore. Heitz Brief at 12. However, Heitz does not identify which of Dr. Blackmore's findings or opinions that the ALJ failed to credit and cites no portion of the ALJ's decision in making this claim. He

simply asserts that Dr. Blackmore "reported that [Heitz's] disabilities prevented him from performing competitive work." *Id.*

The court notes that the ALJ relied unequivocally on Dr. Blackmore's medical records several times in his decision. *See, e.g.,* R. at 16 (noting that Dr. Blackmore "reported in June 2004 that [Heitz's] symptoms had been marginally manageable, but that they break through when he is irritated or there is a disturbance in his usual routine."). In his July 13, 2005 letter to DDS, Dr. Blackmore opined that Heitz is "moderately to severely impaired in most areas of mental functioning."[1] R. at 275. He reported that Heitz is "making progress but is still very impaired currently." *Id.* Dr. Blackmore opined that, "after years[, Heitz will] be able to work half time at a simple low stress job." *Id.*

To the extent the ALJ's decision constitutes a rejection of Dr. Blackmore's opinion to DDS, the ALJ was not required to credit such opinion. "Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). However, "[a] medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Id.* (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner.")).

### 4. Credibility determination of Dr. Johnson

Heitz argues that the ALJ "failed to credit" Dr. Johnson. Heitz Brief at 12. Again, Heitz does not identify which of Dr. Johnson's findings or opinions the ALJ failed to

---

[1] The court notes that Dr. Blackmore submitted his letter to DDS nearly six months after he stopped treating Heitz.

credit. He asserts that Dr. Johnson "reported that [Heitz's] disabilities prevented him from performing competitive work." *Id.*

In 2006, Dr. Johnson conducted a consultative psychological examination of Heitz and concluded that "it seems unlikely that [Heitz] could maintain attention, concentration, and pace, or to interact appropriately with supervisors, coworkers, and the public, or to use good judgment, or to respond appropriately to changes in the workplace." R. at 307. The ALJ correctly identified Dr. Johnson as "a non-treating source[.]" *Id.* at 20. The ALJ found that "the degree of limitation [Dr. Johnson] suggests appears inconsistent with [Heitz's] statements to him, and with [Dr. Johnson's] examination findings." *Id.* at 20. Accordingly, the ALJ concluded that "[t]he opinion of Dr. Johnson is afforded limited weight." *Id.*

In reaching this conclusion, the ALJ noted that Heitz told Dr. Johnson that he did daily chores, fed his uncle's farm animals, socialized with friends, fished and hunted. The ALJ also noted that Dr. Johnson found that Heitz had "no less than below average attention . . . and below average concentration[.]" *Id.* Dr. Johnson also found that Heitz had "good articulation, fluency, and comprehension, although he had to deliberate about some fairly simple comprehension questions." *Id.* The ALJ's decision to afford Dr. Johnson's opinion limited weight is supported by the ALJ's findings that the opinion was inconsistent with "[Heitz's] statements to [Dr. Johnson] and with his own examination findings." *Id.*

### 5.     *Heitz's parents' credibility determination*

Heitz argues that the ALJ "failed to credit" his parents. Heitz Brief at 12. Again, Heitz does not identify what testimony or evidence the ALJ failed to credit. He merely claims that his parents "reported that [Heitz's] disabilities prevented him from performing competitive work." *Id.*

Heitz's argument is without merit for several reasons. First, Heitz's parents are not qualified to render an opinion on his ability to work. *See Black v. Apfel*, 143 F.3d 383,

387 (8th Cir. 1998) (stating that claimant's parents "were not qualified to give an opinion regarding [claimant's] capacity to work"). Second, the ALJ did not indicate that he found Heitz's parents not credible. Rather, the ALJ expressly considered the testimony and other evidence submitted by his parents. For example, the ALJ noted that, according to Heitz's mother, it is hard for Heitz to "warm up and be comfortable with people" and that "he doesn't get along well with authority figures, and prefers a tight schedule" R. at 16-18. He also noted Joyce Heitz's testimony that, "[e]ven with medication, [Heitz] has reached degrees of being out of control or almost out of control." *Id.* The ALJ noted that Heitz's father testified that "[h]e did not think that [Heitz] would hurt himself, but he might say it." *Id.* In addition to the ALJ's express consideration of the testimony and evidence provided by Heitz's parents, it is worth noting that "an ALJ is not required to discuss every piece of evidence submitted." *Black,* 143 F.3d at 386. "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]" *Id.* The court finds that the ALJ's discussion of the testimony and evidence offered by Heitz's parents negates any claim that the ALJ failed to consider or rejected their testimony and/or opinions. *See id.* ("Given the ALJ's specific references to the medical findings set forth in [the treating physician's] letter, it is highly unlikely that the ALJ did not consider and reject [the treating physician's] opinion that [the claimant] was disabled[.]").

## B. Evaluation of Heitz's Subjective Impairments

Heitz argues that the ALJ improperly weighed his subjective impairments and erred by finding that he was not entirely credible. "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations." *Pearsall*, 274 F.3d at 1217 (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). An ALJ must consider a claimant's subjective complaints of pain in conformity with the standard adopted in *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th

Cir. 1984). *Id*. at 1218.

*Polaski* provides that an ALJ may not discount a claimant's subjective complaints *solely* because no objective medical evidence exists to support it. *Polaski*, 739 F.2d at 1322; *see also* 20 C.F.R. § 404.1529(c)(2) (stating claimant's subjective allegations of pain will not be rejected "solely because the available objective medical evidence does not substantiate [claimant's] statements"). Instead, the ALJ

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

*Id*. at 1322. "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his or her] judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). Before an ALJ may discount a claimant's subjective allegations of pain, "the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead the ALJ to reject the claimant's complaints of pain." *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988). In order to properly discredit a claimant's allegations, the ALJ's "credibility determinations must be supported by substantial evidence." *Id*. (citing *Hardin v. Heckler*, 795 F.2d 674, 676 (8th Cir. 1986)).

The ALJ properly considered Heitz's daily activities. He noted Heitz's success in school, including the fact that Heitz made the honor roll. He also observed that Heitz spent time feeding his uncle's farm animals, doing chores at home, socializing with

friends, hunting and fishing. The ALJ also noted that Heitz drives a car and pursues "daily activities and hobbies." R. at 20. While the ALJ acknowledged that Heitz "has problems with attention," he concluded that "they are at no more than a moderate degree." *Id*. The ALJ also considered precipitating and aggravating factors of Heitz's conditions, including feeling "contaminated" and "large groups of people he doesn't know." *Id*. at 19-20. The ALJ inquired into Heitz's medications and considered Heitz's testimony that his "medication has helped quite a bit," although they can make him tired. *Id*. at 18. The ALJ expressly noted Heitz's "lack of participation in ongoing therapy." *Id*. at 20. The ALJ also relied upon Dr. Johnson's opinion that Heitz "had reached some degree of stability in the thought disorder area . . . [and] an improvement in his depression." *Id*. The court finds that the ALJ gave a "good reason" for discrediting Heitz's subjective complaints to the extent they were inconsistent with his RFC. *Dunahoo*, 241 F.3d at 1038. Accordingly, the court defers to the ALJ's judgment even if every factor was not discussed in depth. *Id*.

### C. Reliance on May's Testimony

Heitz argues that May's testimony does not constitute substantial evidence in support of the ALJ's decision because it was based upon the ALJ's "flawed" hypothetical. Heitz's Brief at 17. The ALJ based his hypothetical RFC on Dr. Christiansen's Psychiatric Review Technique assessment and Mental RFC Assessment. Heitz argues that the ALJ "simply took limitations off of a form provided by a Social Security reviewing doctor who had never seen or examined" Heitz. *Id*. at 16. Heitz asserts that the restrictions contained in the hypothetical "are not consistent with the extensive medical record or the restrictions placed on Mr. Heitz by his treating physician."[2] *Id*. He further argues that the

---

[2] Heitz's argument is unclear. He does not indicate which "treating physician" or which opinions or restrictions the ALJ allegedly failed to include in the hypothetical. The court assumes that Heitz refers to the opinions and restrictions of Dr. Blackmore.

restrictions are "not supported by the testimony of [Heitz] or his parents." *Id.*

"Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996)). "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Id.* (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)). For this reason, "the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* The parameters of the hypothetical question "do not have to include any alleged impairments that the ALJ has rejected as untrue." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997).

As an initial matter, the court notes that Heitz does not identify any particular restrictions that the ALJ failed to include in the hypothetical posed to May.[3] In any event, the court finds that the ALJ's hypothetical accurately set forth Heitz's impairments and resulting limitations. The ALJ's hypothetical included moderate limitations on social functioning, concentration, persistence and pace, the ability to carry out detailed instructions, maintain extended concentration, deal with the general public, accept instruction or criticism from supervisors, get along with co-workers, ask simple questions or respond to changes in the work setting and work routine. The restrictions identified by the ALJ are "substantially supported by the record as a whole[,]" including the medical

---

[3] As part of his argument that the ALJ failed to fully develop the record, Heitz argues that "[t]here were no limitations in the hypothetical to reflect [Heitz's] poor reading ability." Heitz Brief at 18. He goes on to speculate that "[c]ertainly the jobs [identified by May] would require some reading comprehension . . . ." *Id.* Heitz cites no legal or factual authority for this proposition. Further, the ALJ's hypothetical included moderate limitations "in the ability to carry out detailed instructions [and] maintain extended concentration." R. at 40. The hypothetical accurately conveyed the limitations supported by the record, including Heitz's reading ability.

records and opinions of Dr. Blackmore, Dr. Johnson and Dr. Christiansen. *Pickney*, 96 F.3d at 296. Accordingly, May's testimony constitutes substantial evidence in support of the ALJ's decision. *Id.*

### D. Development of the Record

Heitz argues that "the ALJ failed to fully develop the record regarding the effect of [Heitz's] medical impairments on his ability to function." Heitz Brief at 17. Specifically, he argues that the ALJ failed to properly question Heitz about his ability to work around strangers or his propensity to deal with anxiety by removing himself from the situation. He also argues that the ALJ failed to properly question May about potential problems Heitz would face in the occupations she identified, including copy machine operator, cafeteria attendant and courier. Finally, he contends that the record contains "hardly any records from Dr. Boyer, the family doctor who took over [Heitz's] medication after Dr. Blackmore's retirement." Heitz Brief at 18-19.

"The ALJ has a duty to develop the facts fully and fairly, particularly when the claimant is not represented by counsel." *Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994). In order to be fully and fairly developed, the record must be "sufficiently clear to make a fair determination as to whether or not the claimant is disabled." *Id.*; *see also George v. Astrue*, 301 F. App'x 581, 581 (8th Cir. 2008) (stating that the "proper inquiry is whether the record contained sufficient evidence for a fair determination") (citing *Payton*, 25 F.3d at 686).

The ALJ fully and fairly developed the record with regard to his questioning of Heitz and May. Contrary to Heitz's assertions, the ALJ specifically questioned Heitz as to whether he feels comfortable with his friends. Heitz responded that he did, "as long as there isn't new people." R. at 35. The ALJ also specifically questioned May regarding Heitz's ability to work with the general public or deal with criticism from supervisors. Although the ALJ did not question Heitz about his ability to work around strangers or the

general public, it is clear that Heitz was not prejudiced by the ALJ's failure to do so. "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995). The ALJ's hypothetical included moderate limitations in Heitz's "ability to deal with the general public" and his "ability to accept instruction or criticism from supervisors" or to "consistently get along with coworkers[.]" R. at 40. Thus, the ALJ was aware of and considered Heitz's limitations with regard to his anxiety caused by interacting with the public or strangers.

The court also finds that the ALJ fully developed the record with regard to Heitz's medical records. Although Heitz contends that the record contains "hardly any" records from Dr. Boyer, he fails to specify what additional records the ALJ should have sought. The record included medical records from various sources, including Dr. Blackmore, Dr. Johnson, Dr. Royer and Dr. Christiansen. It is unclear whether any additional records exist. The ALJ properly developed the record as to Heitz's medical records. *See George*, 301 F. App'x 581, 581 (rejecting claim that ALJ failed to fully develop the record because claimant failed to specify what, if any, additional records the ALJ should have sought).

### E.  Notice of Right to Representation

The ALJ did not inform Heitz of his right to representation at the beginning of the Hearing. However, near the conclusion of the Hearing, the ALJ stated:

> I neglected to tell you at the start of the hearing that the claimant does have a right to have an attorney help him with his claim. We've essentially completed the hearing, but I'm going to take it under advisement, look at the evidence. But I would tell you this, that if I were to rule against you—and I don't know how I'm going to rule yet until I go back through the evidence—if I were to rule against you, you still have a right to get an attorney or representative to help you with your case. And they can take an appeal to what's called the Appeals Council and . . . that's an easy thing to do. The attorneys and representatives who do these cases on a regular

25

> basis advertise in the telephone book, in the Yellow Pages.
> You don't have to pay a fee up front as a general rule. They'll
> do them on what's called a contingency that's governed by
> federal law. That federal law limits their fee to no more than
> 25 percent of past due Benefits capped at a maximum of
> $5300, whichever is less. And they only get paid if you get
> Benefits. They don't [get] paid at all if you don't get Benefits.
> So that's a valuable right that you might want to look into if I
> were to issue an unfavorable ruling, in other words, if I were
> to rule against [Heitz].

R. at 42.

Heitz argues that the ALJ erred because he did not inform Heitz of his right to representation prior to the Hearing. Specifically, Heitz claims that the ALJ "did not mention [his] right to representation until he was in the process of closing the hearing." Pl. Brief at 19. Heitz claims that, if the ALJ informed him of the benefits of having legal counsel prior to the hearing, he could have obtained counsel that would ensure the full development of the record.

Social Security claimants "may appoint someone to represent [them] in any of [their] dealings with [the Social Security Administration]." 20 C.F.R. § 416.1500. Claimants may appoint as their representative either an attorney or a non-attorney. *Id.* at § 416.1505. SSA regulations also provide that:

> If you are not represented by an attorney and we make a
> determination or decision that is subject to the administrative
> review process . . . and it does not grant all of the benefits or
> other relief you requested or it adversely affects any eligibility
> to benefits . . . we will include with the notice of that
> determination or decision information about your options for
> obtaining an attorney to represent you in dealing with us.

*Id.* at § 416.1506.

Heitz was arguably represented by his mother. On his "Request for Hearing by [ALJ,]" Heitz listed his mother's name, Joyce Heitz, as his representative. R. at 65. On

April 4, 2008, Heitz signed a disability questionnaire that his mother completed. The questionnaire identified his "attorney/representative" as his "parents." *Id.* at 245-46. However, the Hearing transcript states that "[t]he claimant appeared in person and was not represented." R. at 25.

Even assuming that Heitz was not represented by his mother, he was adequately informed of his right to representation. On December 12, 2006, SSA wrote to Heitz to inform him of "the hearing process and things that [he] should do now to prepare for the hearing." *Id.* at 67. In the letter, SSA stated that:

> [Y]ou may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing. If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.

*Id.*

On March 8, 2008, SSA again wrote Heitz to inform him that a hearing in his case would soon be scheduled. In the letter, SSA informed him that "**IF YOU WANT TO OBTAIN A REPRESENTATIVE, YOU SHOULD DO SO IMMEDIATELY**." *Id.* at 72 (emphasis in original). The letter also stated that "[m]any attorneys will represent you and not charge a fee unless your claim is allowed." *Id.*

On April 2, 2008, SSA sent Heitz a "Notice of Hearing." *Id.* at 75. The Notice of Hearing stated that "**You May Choose to Have A Person Represent You**" and informed him that "[i]f you want to have a representative, please get one right away." *Id.* at 77 (emphasis in original).

Heitz was notified of his right to have a representative, including an attorney, on at least three occasions. He concedes that "notices of his right to counsel were sent to him along with the myriad of other forms and notices sent out by the [SSA]." Reply at 1. The court finds that Heitz was adequately informed of his right to obtain a representative, whether it be an attorney or non-attorney. *See Wingert v. Bowen*, 894 F.2d 296, 298 (8th

Cir. 1990) (holding that claimant was properly advised of his right to employ counsel because notice of hearing from SSA "clearly explain[ed] a claimant's right to counsel"); *Huddle v. Barnhart*, 143 F. App'x 721, 722 (8th Cir. 2005) (claimant was properly advised of right to counsel "when her [disability insurance benefits] application was initially denied and again when she received notice of her hearing") (citing *Wingert*, 894 F.2d at 298).

Nonetheless, Heitz contends that the ALJ erred by not informing him of his right to representation prior to starting the Hearing. In support of this argument, Heitz relies upon the Manual on the Social Security Administration Hearings, Appeals and Litigation Law ("HALLEX"). According to Heitz, HALLEX consists of "directives to the ALJ's regarding the ALJ's duties in conducting a hearing[.]" Reply at 1. In a section entitled "Opening Statement and Advisement of the Right to Representation," HALLEX provides:

> Generally, the content and format of the opening statement are within the discretion of the ALJ. However, *if the claimant is unrepresented, the ALJ must ensure that the claimant is capable of making an informed choice about representation.* For example, the ALJ should ask an unrepresented claimant the following questions on the record:
>
> - Did you receive the hearing acknowledgment letter and its enclosure(s)? (If not, the ALJ will provide the claimant with a copy and the opportunity to read the letter.) The ALJ will enter into the record the acknowledgement letter and enclosure(s) sent to the unrepresented claimant.
>
> - Do you understand the information contained in the letter concerning representation? (If not, the ALJ will explain the claimant's options regarding representation, as outlined in the acknowledgement letter. Specifically, the ALJ will explain the availability of both free legal services and contingency representation as well as access to organizations that assist individuals in obtaining representation.

> Once the ALJ has determined that the claimant is capable of making an informed choice, he or she will either *secure on the record the claimant's decision concerning representation, or obtain from the claimant a written waiver of the claimant's right to representation*, which will be marked as an exhibit.

HALLEX I-2-6-52 (emphasis added). HALLEX also provides that the ALJ may postpone the hearing if the claimant wishes to obtain a representative.

As discussed above, the record indicates that Heitz may have been represented by his mother. In which case, the HALLEX directives outlined above would not apply, because they are expressly applicable to cases involving *unrepresented* claimants. Assuming that Heitz was unrepresented, courts are split on the issue of whether the failure to follow a provision of HALLEX is reversible error. Several courts have held that HALLEX is merely an internal guidance tool and therefore lacks the force of law and is not binding. *See Bowie v. Comm'r of Social Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (stating that HALLEX is "not binding on this court"); *Bordes v. Comm'r of Social Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007) (holding that HALLEX provisions "lack the force of law and create no judicially-enforceable rights") (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (holding that SSA Claims Manual "has no legal force, and . . . does not bind the SSA")); *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir. 2003) ("Hallex has no legal force and is not binding. As such, it does not prescribe substantive rules and therefore does not carry the force and effect of law.") (internal citation and quotation marks omitted); *see also George v. Astrue*, 338 F. App'x 803, 805 (11th Cir. 2009) (stating that the assumption that HALLEX carries the force of law is "a very big assumption").

However, the Fifth Circuit Court of Appeals held that:

> While HALLEX does not carry the authority of law, . . . where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required. If

prejudice results from a violation, the result cannot stand."
*Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (citation and quotation marks omitted) (concluding that Appeals Council's failure to comply with HALLEX requirement was not prejudicial to claimant).

The Eighth Circuit Court of Appeals has not considered this issue. However, one court has opined that "the Eighth Circuit [Court of Appeals] would hold that HALLEX does not have the force of law." *Ellis v. Astrue*, No. 4:07CV1031 AGF, 2008 WL 4449452, at *16 (E.D. Mo. Sept. 25, 2008) (Mag. J., Fleissig) (citing *Shontos v. Barnhart*, 328 F.3d 418, 424 n.7 (8th Cir. 2003)).

In the absence of a ruling from the Eighth Circuit Court of Appeals, coupled with the weight of authority that HALLEX does not create judicially-enforceable rights, the court declines to find that an ALJ's failure to follow HALLEX is reversible error. Further, the Eighth Circuit Court of Appeals has clearly held that a claimant is properly advised of their right to representation when such notice is included in a notice of hearing or other documents given to the claimant prior to the hearing. *Wingert*, 894 F.2d at 298; *Huddle*, 143 F. App'x. 721, 722. As the ALJ apparently recognized at the conclusion of the Hearing, it is preferable that an ALJ advise a claimant of their right to representation at the outset of a hearing. However, the court finds that the ALJ did not commit reversible error by not doing so.

## VII.  DISPOSITION

For the foregoing reasons, **IT IS ORDERED** that the determination of the ALJ is **AFFIRMED** and this matter is **DISMISSED**.

**IT IS SO ORDERED.**

**DATED** this 15th day of April, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

31